ORDERED.

Dated:  April 18, 2017

Michael G. Williamson
Chief United States Bankruptcy Judge

UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION
www.flmb.uscourts.gov

In re:                                                Case No. 8:15-bk-07039-MGW
                                                      Chapter 11
Kraz, LLC,

        Debtor.
_____/

Kraz, LLC,                                            Adv. No. 8:15-ap-00655-MGW

        Plaintiff,

v.

Branch Banking & Trust
Company,

        Defendant.
_____/

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

A shared loss agreement is a classic win-win. Under the typical

shared loss agreement, the FDIC absorbs 80% of the losses on a failed

bank's assets that are acquired by another bank. By absorbing a significant

portion of the acquiring bank's losses, the FDIC is able to sell distressed assets without steep risk discounts, increasing the distressed assets' net present value. In exchange for backstopping an acquiring bank's losses, the FDIC requires the acquiring bank to engage in prudent loan workouts, which are often in the best interest of creditworthy borrowers who are able to repay their debts. But the shared loss agreement is only a win-win when the acquiring bank complies with FDIC guidance requiring it to act prudently.

Rather than act prudently, Branch Banking & Trust took a "heads I win, tails you lose" approach to the shared loss agreement in this case. As of December 2014, the Debtor owed BB&T about $4.8 million on a loan it acquired from the FDIC. But when the Debtor received a $5.2 million offer for the property securing BB&T's loan just months before the loan matured, BB&T tried to reap a windfall by providing the Debtor with an estoppel letter that falsely claimed the Debtor owed $6.9 million—$2.1 million more than the actual amount due. If the Debtor paid the extra $2.1 million, BB&T would receive a windfall; if the Debtor refused to pay the extra $2.1 million by the maturity date, it would be forced to default, in which case BB&T would immediately be reimbursed for 80% of its losses based on the value of the loan on the failed bank's books, not the discounted amount BB&T paid for it. BB&T's demand that the Debtor pay $2.1 million more than what was owed prevented the Debtor from paying the loan off, forcing

the Debtor into foreclosure and ultimately bankruptcy. In short, the Debtor lost.

Now, having forced the Debtor to file for chapter 11 bankruptcy to stop the foreclosure, BB&T has continued with its "heads I win, tails you lose" approach in bankruptcy. BB&T filed a $6.9 million proof of claim in this case seeking the $2.1 million it previously tried to coerce from the Debtor, plus more than $600,000 in default interest that has accrued since the loan matured. If BB&T is able to force the Debtor to pay those amounts under a confirmed plan, it will receive a windfall; if the Debtor is unable to pay BB&T's exaggerated claim in full, it will not be able to confirm a plan, inevitably leading to a state court foreclosure—and BB&T would be entitled to keep the $1.7 million it has already received from the FDIC, plus any additional reimbursements.

This time, the Debtor doesn't lose. The Court has already determined BB&T is not entitled to the $2.1 million it previously tried to coerce from the Debtor.[1] And because BB&T caused the maturity default by demanding more than was owed, the Court now concludes BB&T is not entitled to the more than $600,000 in default interest it seeks. The Court also concludes that the Debtor is entitled to nearly $1.2 million in damages—basically the fees and costs it has incurred in this case—because the Debtor never would have had to file for bankruptcy had BB&T provided an accurate estoppel

---

[1] *In re Kraz*, 539 B.R. 887, 892-894 (Bankr. M.D. Fla. 2015).

letter. In the end, the Debtor has to pay BB&T what it is legally entitled to—but not a penny more.

## Findings of Fact

Back in 2006, the Debtor borrowed almost $5.2 million from Colonial Bank to construct a storage facility and flex commercial space known as Causeway Self Storage.[2] The parties' promissory note called for interest-only payments at 5.08% interest for the first two years, and principal and interest payments after that.[3] The note, which was secured by a mortgage on Causeway Self Storage, had a five-year balloon payment due on October 25, 2011.[4]

By 2008, Colonial Bank was in financial distress, which apparently motivated the bank to improperly demand curtailment payments from the Debtor on its loan.[5] Sometime around July 2009, Colonial Bank called the Debtor in default.[6] The following month, Colonial Bank failed, and the FDIC took over all its assets. On August 14, 2009, the FDIC sold all

---

[2] Debtor's Exs. 14 & 16.

[3] Debtor's Ex. 16; Debtor's Ex. 65 at ¶ 3.

[4] Debtor's Ex. 14 at ¶ 3(b); 6/13/16 Trial Tr. at p. 124, ll. 8 – 10.

[5] Debtor's Ex. 4 at p. 2. In his memorandum to the parties, Judge Levens concluded, "Because of financial problems with Colonial, it started putting pressure on these borrowers to make curtailment payments in mid-to-late 2008—while interest-only payments were still being timely made." *Id.* In his final judgment, Judge Levens similarly concludes that "Colonial, due to its own internal financial distress, and while Defendants were current on all payments, began improperly demanding that Defendants make curtailment payments on the loan." Debtor's Ex. 5 at p. 2.

[6] Debtor's Ex. 112 at Ex. E.

Colonial Bank's assets (including the Debtor's loan) to BB&T for $19.1 billion.[7]

Central to BB&T's acquisition of Colonial Bank's assets from the FDIC was a commercial shared loss agreement.[8] A shared loss agreement is a vehicle the FDIC uses to maximize the net present value of a failed bank's assets.[9] When the real estate market is uncertain because real estate values are unstable or declining (as in 2009), an acquiring bank is willing to pay less for a failed bank's assets.[10] The shared loss agreement reduces market uncertainty—and therefore produces a higher purchase price for a failed bank's assets—by guaranteeing 80% of an acquiring bank's losses based on the book value of the failed bank's loans.[11]

---

[7] Debtor's Ex. 109; 6/20/16 Trial Tr. at p. 168, ll. 5 – 8.

[8] Debtor's Ex. 109 at Ex. 4.15B; 6/13/16 Trial Tr. at p. 62, ll. 14 – 17; 6/20/16 Trial Tr. at p. 206, ll. 1 – 11.

[9] 6/13/16 Trial Tr. at p. 112, l. 17 – p. 113, l. 4; Richard B. Gaudet & Jessica Talley-Peterson, *The Loss-Share Loophole*, 32 Am. Bankr. Inst. J. 22 (August 2014) ("The FDIC has relied heavily upon the use of [shared loss agreements] to maximize the liquidation value of failed banks."); *Managing the Crisis: The FDIC and RTC Experience 1980 – 1984*, Federal Deposit Insurance Corporation 193 (August 1998), *available at* https://www.fdic.gov/bank/historical/managing/contents.pdf ([B]y keeping loss share assets in the banking environment (as opposed to the liquidation) environment, the FDIC may benefit by better preserving the value of the assets.").

[10] 6/13/16 Trial Tr. at p. 112, l. 14 – p. 113, l. 4; *Managing the Crisis*, supra note 8, at 194 ("[B]ecause almost every region of the United States had experienced declining markets for commercial real estate in the late 1980s and early 1990s, there was considerable uncertainty regarding collateral values and future economic conditions. Even when acquiring banks were willing to purchase the commercial real estate loan portfolios, they typically would incorporate a large discount into their bid to compensate for the risk of further market declines.").

[11] 6/13/16 Trial Tr. at p. 115, l. 22 – p. 116, l. 5.

A simple example illustrates how a shared loss agreement works:[12] Say an acquiring bank pays $7 for a loan that is carried on a failed bank's books at $10.[13] If the borrower later defaults and the acquiring bank only collects $1 on the loan, then the acquiring bank has a $9 loss under the shared loss agreement (the $10 book value less the $1 recovered on the loan) even though it only paid $7 for the loan.[14] Under the typical shared loss agreement, the FDIC would then reimburse the acquiring bank $7.20 (80% of $9).[15] While the shared loss agreement benefits both the FDIC and acquiring bank, the way it is structured can lead to abuse.[16]

Because shared loss agreements provide reimbursement up front, an acquiring bank acting in bad faith has an incentive to declare borrowers in default, rather than work with them.[17] By immediately declaring a borrower in default, the acquiring bank will trigger its reimbursement rights, thereby increasing its investment yield by speeding up its recovery.[18] If the acquiring bank is unable to recover from the borrower, there is no problem because the acquiring bank has already been reimbursed by the FDIC. If

---

[12] *Id.* at p. 115, l. 7 – p. 116, l. 12.

[13] *Id.* at p. 115, l. 25 – p. 116, l. 2.

[14] *Id.* at p. 116, ll. 3 – 9.

[15] *Id.*

[16] *Loss-Share Loophole*, supra note 9.

[17] *Id.* at 22.

[18] *Id.*

the acquiring bank is able to recover from the borrower, it has to reimburse the FDIC; in the meantime, though, it has essentially benefited from an interest-free loan.

But there is a catch: In exchange for the FDIC backstopping its losses, the acquiring bank is required under the shared loss agreement to employ prudent business and banking practices, exercise its best business judgment in charging off loans, and use its best efforts to maximize recoveries on shared loss assets.[19] From time to time, the FDIC issues Risk Sharing Asset Management Guidance to clarify acquiring banks' obligations under shared loss agreements. For instance, the FDIC has cautioned acquiring banks against charging off a commercial real estate loan—thereby triggering reimbursement under the shared loss agreement—where the loan is performing.[20] Where a commercial real estate loan is performing, the FDIC recognizes that prudent workouts are ordinarily in the best interest of the borrower and the acquiring bank.[21] Where a borrower can no longer perform, the FDIC requires an acquiring bank to determine which of the

---

[19] 6/13/16 Trial Tr. at p. 113, ll. 5 – 20; Debtor's Ex. 109 at Exhibit 4.15B, § 3.2.

[20] *Submitting Charge-Offs of Performing Commercial Real Estate Shared-Loss Loans for Reimbursement*, Risk Sharing Asset Management Guidance, RSAM Guidance 2013-G002 (Apr. 2, 2013). Debtor's Ex. 152.

[21] *Workouts for Acquired Commercial Real Estate Shared-Loss Loans*, Risk Sharing Asset Management Guidance, RSAM Guidance 2013-G005 (May 28, 2013). Debtor's Ex. 151.

usual options—loan workout, short-sale, deed in lieu of foreclosure, foreclosure, or litigation—would yield the highest net present value.[22]

Here, BB&T made no attempt at a loan workout with the Debtor, nor did it do any net present value analysis of its collection options. Instead, within months after buying the Debtor's loan, which Colonial Bank had already improperly declared in default, BB&T charged off $1.8 million,[23] triggering a $1.4 million reimbursement by the FDIC, and then filed its foreclosure action in July 2010.[24] While the lawsuit was pending over the next two years, BB&T charged off another $210,000,[25] resulting in another $168,000 in reimbursements.[26] In all, BB&T received nearly $1.7 million in reimbursements from the FDIC based on the Debtor's alleged default.

But BB&T's state court foreclosure action was ultimately unsuccessful.[27] Circuit Court Judge William P. Levens concluded that, although Colonial Bank had declared the Debtor in default, a bona fide default never actually occurred.[28] The evidence in the foreclosure action

---

[22] *Id.*

[23] BB&T's Ex. 37; 6/20/16 Trial Tr. at p. 169, ll. 7 – 14.

[24] Debtor's Ex. 112; 6/13/16 Trial Tr. at p. 121, l. 21 – p. 122, l. 8.

[25] 6/20/16 Trial Tr. at p. 170, l. 15 – p. 171, l. 9.

[26] 6/13/16 Trial Tr. at p. 121, l. 21 – p. 122, l. 8.

[27] Debtors' Exs. 4 & 5.

[28] Debtor's Ex. 4 at 2 (Judge Levens concluded: "The bottom line is that there was a long and unblemished record of timely monthly payments. There are justifiable and equitable grounds to conclude that a bona fide default did not occur, and the resulting loan acceleration and lawsuit were improvidently initiated.").

showed that the Debtor, in fact, had a "long and unblemished record of timely monthly payments."[29] In Judge Levens' view, BB&T "improvidently" accelerated the Debtor's loan and filed the foreclosure action because it was in the bank's interest to do so under the shared loss agreement.[30] So on May 18, 2012, Judge Levens entered a judgment reinstating the Debtor's loan nunc pro tunc to June 30, 2009.[31]

The final judgment contained two important provisions: First, Judge Levens extended the maturity date on the Debtor's loan fourteen months from the judgment's effective date.[32] Second, Judge Levens determined BB&T was not entitled to accrued interest:

> As there was no "default," there are no accrued principal and interest payments due from [the Debtor].[33]

The final judgment, which was intended to put the parties in the position they were in before the foreclosure action, did not become effective until the parties agreed on a new payment schedule.

---

[29] *Id.*

[30] *Id.*; Debtor's Ex. 5 (Judge Levens further concluded: "The evidence is also clear that, both on legal and equitable grounds, a bona fide default never occurred, and the resulting loan acceleration and lawsuit were improvidently initiated by [BB&T] for purposes of trying to maximize collection simultaneously from the FDIC pursuant to the [shared loss agreement] and from [the Debtor and its principals] pursuant to the loan documents, and from the future sale of the property after favorable stabilization occurred.").

[31] Debtor's Ex. 5.

[32] *Id.* at p. 4 (Judge Levens ordered: "The maturity of the loan is extended fourteen months from the effective date of this order.").

[33] *Id.*

As part of its effort to establish the new payment schedule, BB&T confirmed to the state court on three separate occasions that it understood it was not entitled to accrued interest.[34] In a motion filed six months after the state court judgment, BB&T provided an adjusted note balance, which it said omitted and excused 25 months of accrued interest, "as provided in the Final Judgment."[35] On December 30, 2013, nearly a year-and-a-half after the final judgment, BB&T moved to compel the Debtor to begin making $30,760.49 monthly mortgage payments.[36] BB&T's proposed monthly payment was based on a $4,799,763.98 adjusted note balance, which did not include any accrued interest after June 30, 2009.[37] At a hearing on its December 30 motion, BB&T again confirmed its accounting did not include any accrued interest after June 2009:

> Judge Levens: **So you are not trying to tack on—**
>
> BB&T's Counsel: It is that seven—
>
> Judge Levens: **—interest during all this—**
>
> BB&T's Counsel: **No. There is no interest added on for the entire— from June 2009 through**

---

[34] Debtor's Ex. 7 at ¶ 10; Debtor's Ex. 31 at p. 6, ll. 7 – 12; p. 14, l. 4 – p. 15, l. 14; Debtor's Ex. 65 at ¶ 2.

[35] Debtor's Ex. 7 at ¶ 10. BB&T alleged in its motion, "The Adjusted Balance, for example . . . omits and excuses approximately twenty-five (25) months of interest provided for under the Loan Documents from the date that the Obligors stopped paying on the Obligation until the Judgement Date . . . ." *Id.*

[36] Debtor's Ex. 65.

[37] *Id.* at ¶ 2.

**today, there is no interest added on in this accounting that was filed with the court.[38]**

Based on BB&T's accounting, which did not include accrued interest, the state court entered an order requiring the Debtor to begin making $30,760.49 monthly payments on February 28, 2014, which meant the new maturity date for the loan was April 28, 2015.

Between February 28, 2014 and April 28, 2015, the Debtor made each of the regular $30,760.49 monthly payments. In the meantime, with the maturity date fast approaching, the Debtor was intent on selling the property.[39] Because it had invested more than $2 million in the property, the Debtor had no intention of letting BB&T foreclose on the property after the maturity date.[40] To avoid a maturity default, the Debtor had two options: refinance the property or sell it.

As luck would have it, on October 2, 2014, just seven months before the maturity date, the Debtor received an offer from iStorage to buy Causeway Self Storage for $5,175,000[41]—nearly $500,000 more than BB&T admitted was owed just eight months earlier.[42] There is no question that

---

[38] Debtor's Ex. 31 at p. 6, ll. 7 – 12; p. 14, l. 4 – p. 15, l. 14 (emphasis added). During its appeal of the final judgment, BB&T also confirmed it was not entitled to interest. Debtor's Ex. 148 at ¶ 20.

[39] 6/14/16 Trial Tr. at p. 17, ll. 12 – 14.

[40] *Id*. at p. 17, ll. 15 – 18.

[41] Debtor's Ex. 73; 6/14/16 Trial Tr. at p. 20, ll. 10 – 16; p. 26, l. 23 – p. 27, l. 1.

[42] Debtor's Ex. 65 at ¶ 2.

iStorage was a real (qualified) potential buyer.[43] iStorage actually submitted two $5,175,000 letters of intent: one dated October 2, 2014; the other dated December 31, 2014.[44] The second one was accompanied by a letter from USAmeriBank confirming iStorage's general partner had $5 million in his account.[45]

To respond to iStorage's offer—whether to accept it or make a counteroffer—the Debtor needed an estoppel letter so it would know how much money it had to pay BB&T to satisfy the bank's lien. The Debtor told BB&T it had a buyer that wanted to close by the end of the year, well before the loan's maturity date.[46] But BB&T initially refused to provide an estoppel letter, insisting on the unusual step of seeing a purchase agreement first.[47] When BB&T did finally provide an estoppel letter on December 31, 2014, it was for $6,938,227.27—$2.1 million more than the bank said the Debtor owed a year earlier![48]

According to the estoppel letter, the Debtor owed $5,146,773.61 in principal, plus $1,136,998.72 in accrued interest from June 2009 through December 2014, along with $654,454.94 in attorney's fees and costs it

---

[43] 6/14/16 Trial Tr. at p. 22, ll. 1 – 5.

[44] Debtor's Exs. 73 & 74; 6/14/16 Trial Tr. at p. 20, ll. 10 – 16; p. 26, ll. 1 – 25.

[45] Debtor's Exs. 74 & 75.

[46] 6/14/16 Trial Tr. at p. 24, ll. 18 – 25.

[47] 6/13/16 Trial Tr. at p. 34, l. 15 – p. 35, l. 8; 6/14/16 Trial Tr. at p. 22, ll. 6 – 23; p. 25, ll. 2 – 19; p. 58, ll. 1 – 20; p. 59, ll. 6 – 12; Debtor's Ex. 119.

[48] Debtor's Ex. 36 at p. 2.

incurred in its unsuccessful foreclosure action.[49] For reasons that are unclear, BB&T's estoppel letter failed to give the Debtor the benefit of nearly $400,000 in credits required under the state court final judgment.[50] But the main difference between the $4.8 million BB&T told the state court it was owed in December 2013 and the $6.9 million amount in BB&T's December 2014 estoppel letter was the $1.1 million in accrued interest that BB&T previously confirmed had been omitted and excused under the state court final judgment.

To make a long story short, the sale to iStorage never went through because BB&T insisted the Debtor owed more than iStorage was willing to pay.[51] The Debtor could not counter iStorage's offer—much less accept it— without an accurate estoppel letter.[52] Nor could the Debtor refinance its loan without an accurate estoppel letter.[53] With the Debtor unable to sell or

---

[49] *Id.*

[50] Debtor's Exs. 5 & 36. The final judgment required BB&T to turn over all funds that were being held by the court-appointed receiver. Debtor's Ex. 5 at p. 4. The final judgment also obligated BB&T to provide an accounting of all amounts paid to the receiver, the receiver's attorney's fees and costs, the costs of litigation paid out of income generated from the Debtor's property, the cost of moving a sign that was on the Debtor's property, and all amounts BB&T received from the FDIC. *Id.* The Second DCA reversed the requirement that BB&T credit the Debtor for amounts the bank received from the FDIC. *Branch Banking & Trust Co. v. Kraz, LLC*, 114 So. 3d 273, 275-76 (Fla. 2d DCA 2013). The remaining amounts, for which the Debtor was entitled to a credit, totaled $391,913.35.

[51] 6/14/16 Trial Tr. at p. 12, l. 6 – p. 13, l. 12; p. 14, l. 4 – p. 15, l. 15; p. 19, ll. 5 – 12; p. 25, ll. 1 – 25; p. 28, l. 22 – p. 29, l. 3; p. 34, l. 22 – p. 38, l. 7.

[52] *Id.* at p. 19, ll. 5 – 12; p. 25, ll. 1 – 25; p. 32, ll. 3 – 15.

[53] 6/13/16 Trial Tr. At p. 189, ll. 7 – 16; 6/14/16 Trial Tr. at p. 12, l. 19 – p. 13, l, 12; p. 14, l. 4 – p. 15, l. 15; p. 17, l. 5 – p. 19, l. 25; p. 34, l. 22 – p. 38, l. 17.

refinance the property, the April 28, 2015 maturity date came and went with no balloon payment.

But rather than go back to state court to foreclose, where it had previously been unsuccessful, BB&T opted to file its foreclosure action in federal district court.[54] To stop what it perceived to be another attempt to wrongfully foreclose, the Debtor filed this bankruptcy case. After the Debtor filed for bankruptcy, BB&T filed a $6.3 million proof of claim: $4,754,860.26 in principal; $288,091.74 in real estate taxes; $8,996.40 in forced-place insurance; $1,060,640.25 in accrued interest from June 30, 2009 to April 28, 2015; and $227,972.50 in post-maturity default interest.[55]

The Debtor filed an adversary complaint objecting to the BB&T's proof of claim.[56] Specifically, the Debtor alleged that BB&T was not entitled to accrued interest, attorney's fees, post-maturity default interest, the real estate taxes, or the cost of forced-place insurance.[57] In its complaint, the Debtor also sought compensatory and punitive damages from BB&T for breach of contract, fraud, constructive fraud, fraudulent misrepresentation,

---

[54] *Branch Banking & Trust Co. v. Kraz, LLC*, Case No. 8:15-cv-01042-EAK-AEP, Middle District of Florida, Tampa Division.

[55] Claim No. 3-1.

[56] *Kraz, LLC v. Branch Banking & Trust Co.*, Adv. No. 8:15-ap-00655-MGW, Adv. Doc. No. 1. The Debtor filed its initial adversary complaint on July 23, 2015. It later filed an amended complaint on February 24, 2016. Adv. Doc. No. 73.

[57] Adv. Doc. No. 73.

14

negligent misrepresentation, slander of title, and tortious interference—all revolving around the falsely inflated December 31, 2014 estoppel letter.[58]

Early on, the Court recognized that the amount of BB&T's claim needed to be resolved before the Debtor could confirm a plan. So the Debtor and BB&T each moved for summary judgment on BB&T's entitlement to accrued interest, post-maturity default interest, attorney's fees, and the other items.[59] In an October 27, 2015 Memorandum Opinion, this Court determined that the principal amount of BB&T's claim was $4,754,860.26 and that BB&T was not entitled to $1,060,640.25 in accrued interest or $671,780.48 in attorney's fees (which it later included as part of its claim).[60]

But three issues remained: First, was BB&T entitled to $288,091.74 in property taxes?[61] Second, was BB&T entitled to default interest since the April 28, 2015 maturity date?[62] Third, was the Debtor entitled to compensatory or punitive damages on its affirmative claims, which would offset the amount BB&T was entitled to on its claim? Although the Court had not resolved those open issues, it was able to confirm the Debtor's chapter 11 plan by estimating BB&T's claim at $5,568,730.15, which

---

[58] *Id.*

[59] Doc. Nos. 129 & 130.

[60] *In re Kraz*, 539 B.R. 887, 892-894 (Bankr. M.D. Fla. 2015).

[61] Although BB&T originally sought $8,996.40 for forced-place insurance, it later withdrew that claim. 6/20/16 Trial Tr. at p. 148, ll. 11 – 18.

[62] *In re Kraz*, 539 B.R. at 895-96 & n.50.

15

assumed the worst-case scenario for the Debtor—i.e., that BB&T would recover the taxes and post-maturity default interest and that the Debtor would not recover any damages on its claims.

The Court must now resolve the remaining issues. Except for its defense to BB&T's claim for unpaid real estate taxes, each of the Debtor's other defenses, as well as all its claims for relief, hinge on its allegation that BB&T's falsely inflated December 31, 2014 estoppel letter thwarted the Debtor from selling or refinancing its property. Because this Court previously determined that BB&T was not entitled to the more than $1 million in accrued interest it included in its December 31, 2014 estoppel letter,[63] the Court need only decide now whether BB&T's failure to provide an accurate estoppel letter excuses post-maturity default interest and gives rise to damages for breach of contract, constructive fraud, tortious interference, and slander of title.

## Conclusions of Law

For the reasons set forth below, the Court concludes—after four days of trial—that BB&T's failure (or refusal) to provide an accurate estoppel letter prevented the Debtor from paying off the loan before it matured, which led to this bankruptcy case. Therefore, BB&T is precluded from recovering post-maturity default interest, and the Debtor is entitled to recover the costs it has incurred as a result of this case. But the falsely

---

[63] *Id.* at 892-94.

inflated estoppel letter does not give rise to compensatory or punitive damages for constructive fraud, tortious interference, or slander of title.[64] After setting off the Debtor's damages against the amounts BB&T is entitled to recover on its proof of claim, the Court concludes BB&T's $5,568,730.75 estimated claim shall be allowed in the amount of $3,477,752.75.

*This Court has authority to enter final judgment on the Debtor's claim objection and breach of contract counterclaim.*

The statutory basis for the Court's authority to enter a final judgment in this proceeding is simple. By statute, the Court can hear and determine all core proceedings.[65] Under 28 U.S.C. § 157, core proceedings include allowance and disallowance of claims against the estate and counterclaims to claims against the estate.[66] But we now know from *Stern v. Marshal*[67] that an additional level of analysis is required. Under *Stern*, not only must a proceeding be statutorily core for this Court to enter a final judgment, but this Court must also have the constitutional authority to do so.

In *Stern*, the Supreme Court held that the bankruptcy court lacked constitutional authority to enter a final judgment on a state common-law counterclaim to a proof of claim even though the counterclaim was

---

[64] The Court resolved the other claims (in BB&T's favor) on summary judgment.

[65] 28 U.S.C. § 157(b)(1).

[66] 28 U.S.C. § 157(b)(2)(B)-(C).

[67] *Stern v. Marshall*, 564 U.S. 462 (2011).

statutorily core.[68] As this Court explained in *In re Safety Harbor*, Congress cannot statutorily withdraw jurisdiction from Article III courts:

> A constitutional problem arises when, by operation of a statute (in this case section 157(b)(2)(C)), a common-law cause of action that is merely "related to" a bankruptcy case is defined as core. Simply put, Congress cannot withdraw from the jurisdiction of Article III courts, suits founded on "common law, or in equity or admiralty," simply by redefining them as something different from what they are.[69]

But the Court in *Stern* did not hold bankruptcy courts never have authority to enter a final judgment on a state-law counterclaim.

The *Stern* Court identified two instances where bankruptcy courts can finally adjudicate a state-law counterclaim. The first instance is where the counterclaim stems from the bankruptcy itself; the second instance is where the counterclaim is necessarily resolved as part of the claims allowance process and nothing remains for adjudication once the claims objection is resolved.[70] Here, the Debtor's contract claim easily falls within the second instance.[71]

The Debtor's breach of contract counterclaim is necessarily resolved as part of adjudicating whether BB&T has a claim for post-maturity default

---

[68] *Id.* at 502.

[69] *In re Safety Harbor*, 456 B.R. 703, 715 (Bankr. M.D. Fla. 2011) (internal citations omitted).

[70] *Stern*, 564 U.S. at 496-99.

[71] BB&T does not dispute that the Court has authority to finally adjudicate the Debtor's claim objection. Adv. Doc. No. 80.

interest.[72] That is because the same evidence that is sufficient to deny

BB&T post-default maturity interest—i.e., that BB&T's falsely inflated

estoppel letter prevented the Debtor from selling or refinancing its

property—is sufficient to find in the Debtor's favor on its contract claim. So

there would be nothing left for the district court to do. As for the remaining

tort claims, the Court is ruling in BB&T's favor, and the Debtor has

consented to entry of final judgment on its counterclaims.

*BB&T is not entitled to any post-maturity default interest.*

As this Court explained in its earlier Memorandum Opinion, Florida

courts have held, in a variety of contexts, that the refusal to accept a proper

tender will prevent the collection of interest because the failure to receive

payment is due to the promisee's own action:

> In those cases the tender of performance will not
> operate as a discharge of the debtor nor does the
> refusal to accept the money tendered operate as a
> discharge of the debt. However, the refusal to accept
> a proper tender will prevent the collection of
> interest or other damages because the failure to
> receive payment is due to the promisee's own
> action.[73]

The evidence at trial was clear that BB&T did not receive the balloon

payment by the maturity date because of its own actions.

---

[72] *Stern v. Marshall,* 564 U.S. 462, 487 (2011) (bankruptcy court may enter final judgment on counterclaim where counterclaim is completely resolved through the bankruptcy court's claims adjudication process so that nothing will remain for adjudication by another court).

[73] *In re Kraz*, 539 B.R. 887, 895 (Bankr. M.D. Fla. 2015). (quoting *Multach v. Adams*, 418 So. 2d 1254, 1255 (Fla. 4th DCA 1982)).

In December 2014, just four months before the maturity date, the Debtor had a pending offer to buy its property for $5,175,000. Only a year earlier, BB&T represented to the state court that the adjusted note balance, taking the state court's final judgment into account, was $4,799,763.98.[74] So even if the Debtor accepted iStorage's offer without any counteroffer, it would have had enough money to pay off BB&T and still pocket around $375,000. But one thing kept the sale from going through: BB&T's refusal to provide an accurate estoppel letter.

BB&T, however, contends that post-maturity default interest should not be excused here since the Debtor never actually made a tender.[75] To be sure, tender does have, as BB&T contends, a "definite legal signification:"

> It imports not merely the readiness and ability to pay the money or to deliver the deed or other property, at the time and place mentioned in the contract, but also the production of the thing to be paid or delivered and an offer of it to the person to whom the tender is made.[76]

The question here, however, is not whether the Debtor tendered the balloon payment. It obviously did not. The question is whether BB&T prevented the Debtor from tendering the balloon payment.

On that score, there can be no doubt. It is undisputed that BB&T never provided the Debtor with an accurate estoppel letter, and BB&T has

---

[74] Debtor's Ex. 65 at ¶ 2.

[75] Adv. Doc. No. 242.

[76] *Id.* at 4 (quoting *Rissman ex rel. Rissman Inv. Co. v. Kilbourne*, 643 So. 2d 1136, 1140 (Fla. 1st DCA 1994)).

failed to explain how the Debtor could sell or refinance the property without an accurate estoppel letter. BB&T instead cites case law for the proposition that failure to provide an accurate estoppel letter does not discharge the payment of interest.[77] Of course it doesn't. But where a lender's refusal to provide an accurate estoppel letter prevents a borrower from tendering a balloon payment is a different story. What principled basis would there be for an equitable rule that precludes a lender from recovering interest where it refuses a tender but not where it prevents a tender in the first place?

BB&T also offers two other justifications for avoiding the rule that refusing a tender excuses the obligation to pay interest. First, it says its estoppel letter really didn't cause any sale to fall through. After all, BB&T points out that iStorage continued to extend its letter of intent, even increasing its offer to $6,250,000 after the Debtor filed for bankruptcy. Second, BB&T suggests the Debtor could have executed a sale contract conditioned on agreeing with BB&T on a payoff number. Neither of these arguments has any merit.

To begin with, what iStorage was willing to do after the Debtor filed this case is beside the point. A $6.25 million offer from iStorage six months after the Debtor's loan matured—and after substantial default interest had begun accruing—is obviously too late. What's more, the $6.25 million offer was still $750,000 less than BB&T was falsely claiming was owed. And

---

[77] *Id.* at 2-4 (citing *EDE Props., Inc. v. Eckert*, 872 So. 2d 385 (Fla. 4th DCA 2004) and *Eckert Realty Corp. v. Eckert*, 941 So. 2d 426 (Fla. 4th DCA 2006)).

there has been no evidence BB&T would have agreed to take a $6.25 million payoff. So the $6.25 million could not have helped the Debtor avoid a maturity default.

Moreover, the idea that the Debtor could have done some conditional sale—even if suggested by one of its own brokers—is utterly implausible. How would that have worked? Putting aside the fact that iStorage's $6.25 million offer came after the maturity date, assume the Debtor accepted it conditioned on BB&T agreeing to a $6.25 million. What reason is there to think BB&T would have agreed to a $6.25 million payoff? Worse, what if BB&T did accept the proposed $6.25 million payoff under the guise of giving the Debtor a discount? Had BB&T done so, the Debtor would have been deprived of more than $1.4 million in equity. The Debtor should not be penalized for refusing to go along with BB&T's "heads I win, tails you lose" approach.

It is important to make one last point in denying BB&T its post-maturity default interest: BB&T's decision to seek $2.1 million more than it was owed was intentional. BB&T offers a number of explanations why it thought it really was entitled to the $2.1 million. None of them are plausible. The bulk of the $2.1 million was accrued interest. But the language of Judge Levens' final judgment was clear:

> As there was no "default," there are no accrued principal and interest payments due from [the Debtor].[78]

---

[78] Debtor's Ex. 5 at p. 4.

And BB&T—on at least three occasions—confirmed it understood it was not entitled to interest. At this point, a curious reader must be asking why BB&T would intentionally misrepresent the amount owed on the loan, preventing the Debtor from paying it off.

In effect, BB&T was playing a game of "chicken." BB&T used the looming maturity date—and the threat of default—to try to capture $2.1 million in interest and attorneys' fees it was previously denied in state court. In the banking world, it would ordinarily not be in BB&T's interest to play "chicken" over the interest and attorneys' fees. As the Debtor's expert explained, when a bank is attempting to collect distressed debt, it has to weigh the potential risk and reward of each action.[79] A default—the risk in using a looming maturity date to coerce a borrower to pay more than it owes—could tie the bank up in expensive litigation and subject the bank to potential lender liability claims.[80] But in this case, the possibility of a default posed no risk to BB&T.

The reason that is true is because of the shared loss agreement. The starting point for understanding why is a concept known as "purchase accounting," which is mandated for banks acquiring failed assets from the FDIC.[81] Under purchase accounting, an acquiring bank, such as BB&T, is

---

[79] 6/20/16 Trial Tr. at p. 127, ll. 2 – 20.

[80] *Id*. at p. 127, ll. 2 – 20.

[81] 6/13/16 Trial Tr. at p. 114, l. 6 – p. 115, l. 6.

required to recognize assets it acquired from a failed institution (such as a pool of loans) at their fair value.[82] To determine fair value, the acquiring bank discounts the amount it expects to receive over the life of the loans to net present value.[83] Accretable yield is the expected cash flow that exceeds the acquiring bank's initial investment.[84] "In other words, accretable yield is the expected rate of return on investment."[85] Under the shared loss agreement, an acquiring bank can increase its yield by shortening the time for collection.

How does an acquiring bank do that? By declaring the loan in default, the acquiring bank triggers the reimbursement rights under the shared loss agreement. In effect, the acquiring bank is using the shared loss agreement as a means of generating cash flow rather than backstopping losses.[86] Significantly, it doesn't matter who the bank gets its money from—i.e., the borrower or the FDIC.[87] If an acquiring bank collects on a loan quicker than expected—even if it is because it declared the loan in default and was reimbursed by the FDIC—its yield will go up.

---

[82] *Id.* at p. 114, l. 6 – p. 115, l. 6.

[83] *Id.*

[84] 6/20/16 Trial Tr. at p. 257, l. 25 – p. 258, l. 13.

[85] Richard B. Gaudet & Jessica Talley-Peterson, *The Loss-Share Loophole*, 32 Am. Bankr. Inst. J. 22 (August 2014).

[86] *Id.* at 22 – 23.

[87] 6/13/16 Trial at p. 141, l. 9 – p. 142, l. 5.

The numbers in this case bear that out. Here, the Debtor's expert, Richard Gaudet, testified that if BB&T had negotiated a five-year extension of the Debtor's loan at 5.08% interest (amortized over 30 years), its yield would have been 8.4%.[88] If BB&T decided to play chicken and use the maturity date to try to recapture $2.1 million in interest or fees, one of three things would have happened: the Debtor could have paid the estoppel letter in full; the Debtor could have refused, resulting in a successful foreclosure; or the Debtor could have refused, resulting in bankruptcy.[89]

In all three cases, the yield is higher than it would have been had BB&T entered into a loan workout with the Debtor. Not surprisingly, the highest yield (measured from the effective date of the final judgment) would have been if the Debtor paid the falsely inflated estoppel letter—an astonishing 106.12%.[90] A successful foreclosure would have resulted in a 41.05% yield from the effective date of the final judgment.[91] In what would normally be the worst-case scenario—i.e., where the Debtor files for bankruptcy—BB&T's yield would still be 16.34%, which is nearly double what it would have been had BB&T entered into a loan workout with the Debtor.[92]

---

[88] *Id.* at p. 135, l. 19 – p. 136, l. 2.

[89] *Id.* at p. 138, l. 25 – p. 141, l. 2.

[90] 6/13/16 Trial Tr. at p. 139, ll. 3 – 20; Debtor's Ex. 142 at p. 23.

[91] 6/13/16 Trial Tr. at p. 139, l. 21 – p. 140, l. 7; Debtor's Ex. 142, at pp. 24 – 25.

[92] 6/13/16 Trial Tr. at p. 140, ll. 8 – 20; Debtor's Ex. 142 at Appendix C.

So as Mr. Gaudet points out, it's a no-lose situation for the bank.[93] Because the yield from forcing the Debtor into bankruptcy would have been higher than simply entering into a loan workout with the Debtor, there was no disincentive for BB&T to play chicken in hopes of reaping a windfall. Notably, BB&T never offered an expert to rebut Mr. Gaudet's testimony that the shared loss agreement motivated BB&T to seek more than was owed.

BB&T instead offers three reasons why the Court should not give any weight to Mr. Gaudet's testimony. First, BB&T spent a significant amount of time at trial trying to rebut Mr. Gaudet's testimony that BB&T paid fair value rather than book value for the Debtor's loan. Second, BB&T says its own expert—Steve Oscher—testified that Mr. Gaudet's theory hinges on an incorrect interpretation of how recoveries are applied under the shared loss agreement. According to Mr. Oscher, BB&T would still have a cash loss. Third, BB&T says the Debtor failed to offer any evidence that any BB&T employee was aware of the incentives under the shared loss agreement. Each of these arguments is easily disposed of.

Although the Court is not convinced BB&T paid book value for Colonial Bank's impaired loans, whether it did is a red herring. Mr. Gaudet specifically testified that his financial incentive motivation theory hinges

---

[93] 6/13/16 Trial Tr. at p. 140, l. 21 – p. 141, l. 2.

on the basis BB&T used to report the Debtor's loan on the bank's books.[94] As for the testimony by BB&T's expert, the Court is familiar with Mr. Oscher, who is generally well regarded by the Court. But unlike Mr. Gaudet, Mr. Oscher has no specialized knowledge, skill, experience or training, or education concerning shared loss agreements.[95] And he had never done any analysis of application of payments under a shared loss agreement before. On this matter, it came down to a credibility determination, and the Court simply found Mr. Gaudet substantially more credible. As for the lack of any evidence that BB&T knew about the incentives under a loss share agreement, the Court is more persuaded by the fact that BB&T failed to offer any justification for its insistence on collecting more than $1 million in interest that Judge Levens plainly ruled it wasn't entitled to.

To circle back, the discussion of BB&T's motivation is relevant— although not essential—to the Court's finding that BB&T is not entitled to post-maturity default interest. In the Court's view, it is sufficient that BB&T prevented the Debtor from making the tender in the first place. It is simply more egregious that BB&T did so in an effort to take advantage of the unintended consequence of how shared loss agreements are structured.

---

[94] 6/20/16 Trial Tr. at p. 256, l. 16 – p. 260, l. 21.

[95] *Id.* at p. 246, ll. 21 – 23.

*BB&T is not entitled to recover for unpaid real estate taxes.*

BB&T's case for $288,091.74 in unpaid real estate taxes was not particularly compelling. Gregory Biegel, a BB&T employee, testified (with little foundation) that the Debtor failed to pay the real estate taxes for 2008 and 2009.[96] According to Biegel, BB&T apparently paid a little over $90,000, by cashier's check, in December 2009 as a partial payment on the 2008 taxes, the remainder of which were paid in March 2010.[97] Biegel says the 2009 taxes were paid in May 2010.[98] But BB&T concedes it does not have a copy of the $90,000 check, and it never offered into evidence copies of the checks for the March and May 2010 payments.[99] So the sole documentary evidence in support of BB&T's claim for unpaid taxes is a printout of the Debtor's loan history, which appears to reflect $288,091.74 in payments by BB&T for taxes (although even that is not clear).[100]

That evidence, however, is contradicted by BB&T's state court foreclosure complaint, which alleges that the Debtor only owed $119,596.33 in property taxes as of July 2010—after BB&T had supposedly made all the payments.[101] And curiously, a motion BB&T filed in state court in December

---

[96] 12/30/15 Trial Tr. at p. 190, ll. 7 – 11.

[97] *Id.* at p. 190, l. 21 – p. 191, l. 12.

[98] *Id.* at p. 191, ll. 9 – 12.

[99] *Id.* at p. 190, l. 7 – p. 191, l. 15.

[100] BB&T's Confirmation Ex. 86.

[101] Debtor's Ex. 12 at ¶ 13.

2013 alleging that the Debtor owed $197,221.99 in unpaid taxes—$90,000 less than they currently claim—even though that amount included taxes for 2010.[102] The Court is unaware of any explanation of why BB&T has claimed at least three different amounts for unpaid taxes—or why the amounts vary as much as $168,000.[103] Nonetheless, even if BB&T had put on competent, substantial evidence that it paid the property taxes, the Court agrees with the Debtor that BB&T is barred by the doctrine of res judicata from recovering the unpaid taxes because BB&T previously sought—but failed to obtain—that relief in state court.

Under the doctrine of res judicata, a party is precluded from relitigating a claim that was or could have been litigated in an earlier proceeding.[104] Here, BB&T concedes it sought to recover the unpaid taxes in the foreclosure action.[105] Its state court foreclosure complaint included specific allegations that the Debtor defaulted under the mortgage by failing to pay property taxes.[106] The complaint specifically requested that the state court enter a judgment against the Debtor for all amounts due under the

---

[102] BB&T's Ex. 15 at ¶ 4.

[103] The difference cannot be attributed to interest. The exhibit BB&T uses to establish that it paid the property taxes is a report apparently generated in 2012 that shows $288,091.74 in taxes.

[104] *In re Bilzerian*, 276 B.R. 285, 291-92 (Bankr. M.D. Fla. 2002)

[105] 6/20/16 Trial Tr. at p. 145, ll. 4 – 19.

[106] Debtor's Ex. 112 at ¶¶ 11 & 13.

loan, including the alleged unpaid taxes.[107] As part of a summary judgment motion it filed in the foreclosure action, BB&T sought $119,596.33 in fees.[108] But at the conclusion of the state court trial, Judge Levens expressly found that the Debtor had not defaulted on its loan.[109] Moreover, the final judgment did not award BB&T any relief, let alone $288,091.74 for unpaid taxes. The fact that Judge Levens tried BB&T's claim for unpaid taxes yet failed to award the bank the relief it sought precludes BB&T from seeking that relief here.

BB&T, however, contends that the state court final judgment is not conclusive. Instead, BB&T contends the final judgment must be read together with a later order Judge Levens entered denying a request by BB&T to stay the final judgment. In his order denying BB&T's motion to stay the final judgment, Judge Levens ruled that the final judgment did not modify the parties' mortgage:

> Nothing in the final judgment modifies any of the contractual provisions regarding borrower's duty to pay the expenses to operate and maintain the property and BB&T's ability to incorporate into the amounts due under the mortgage any amounts not paid by the borrower, but paid by BB&T for taxes, insurance and other matters required for the maintenance of the property.[110]

---

[107] *Id.* at p. 6.

[108] Debtors' Ex. 135 at ¶ 14.

[109] Debtor's Ex. 5 at p. 3.

[110] BB&T's Ex. 6 at 5.

BB&T contends the order denying its request to stay the judgment confirms that Judge Levens did not adjudicate the unpaid tax issue.

But Judge Levens' order does no such thing. For starters, BB&T's interpretation of his order directly contradicts Judge Levens' final judgment, in which he found that a "bona fide default" never occurred. In fact, Judge Levens' order denying the stay reiterates that finding and makes clear that Judge Levens had concluded that the relief BB&T sought at trial "should be denied in its entirety."[111] It is obvious from the context of the order that Judge Levens was dealing with real estate taxes prospectively.

In the order, Judge Levens considers whether the court-appointed receiver should remain in place. Ultimately, Judge Levens concludes the receivership is no longer necessary because it is a wasteful expense that was not producing any benefit to BB&T.[112] It is in the context of discharging the receiver that Judge Levens confirms that his final judgment did not otherwise modify the Debtor's obligation to pay property taxes (and other expenses). Simply put, BB&T's suggestion that Judge Levens used an order denying BB&T's motion to stay his judgment to implicitly award nearly $300,000 in damages not provided for in the final judgment is untenable.

---

[111] *Id.* at pp. 1 – 3.

[112] *Id.* 6.

31

Besides, BB&T's position today is belied by its position before this case was filed. In BB&T's final estoppel letter—after BB&T's appeal had been resolved—BB&T did not include any amount for unpaid taxes. At trial, BB&T's former counsel testified that an estoppel letter "is the most important thing in banking reality."[113] As BB&T's former counsel succinctly put it: "[A]n estoppel estops."[114] The Court is not finding that BB&T is estopped from seeking the unpaid taxes. The Debtor did not object to the taxes on that grounds. Rather, the estoppel letter is evidence that BB&T did not believe Judge Levens' order denying the request to stay the final judgment somehow awarded BB&T nearly $300,000 in unpaid taxes. It is apparent that BB&T is simply latching on to Judge Levens' order in hopes of reviving relief it did not recover in state court, which the doctrine of res judicata precludes this Court from awarding.

*The Debtor is entitled to damages for breach of contract.*

"It is an accepted principle of law that when parties contract upon a matter which is the subject of statutory regulation, the parties are presumed to have entered into their agreement with reference to such statute, which becomes a part of the contract, unless the contract discloses a contrary intention."[115] Here, section 701.04, Florida Statutes, regulates

---

[113] 6/20/16 Trial Tr. at p. 22, ll. 9 – 22.

[114] *Id.*

[115] *Westside EKG Assocs. v. Foundation Health*, 932 So. 2d 134 (Fla. 4th DCA 2005).

estoppel letters in the mortgage context.[116] Specifically, upon request by the mortgagee, section 701.04 requires a mortgagee to provide a mortgagor an estoppel letter setting forth the unpaid balance of a loan.[117] BB&T does not dispute that it had a contractual duty to provide the Debtor with an accurate estoppel letter.

And the evidence at trial was undisputed that BB&T breached that obligation. The Debtor offered evidence at trial that BB&T sent three falsely inflated estoppel letters: an October 1, 2012 estoppel letter in the amount of $9,005,320.80; a May 3, 2013 estoppel letter in the amount of $6,693,263.20; and the December 31, 2014 estoppel letter. BB&T attempts to explain away the $9 million estoppel letter because the bank's appeal of the state court judgment was still pending.[118] That explanation glosses over the fact that the final judgment was never stayed. But in any event, BB&T's appeal had been adjudicated—mostly in the Debtor's favor—by the time BB&T gave the May 3, 2013 and December 31, 2014 estoppel letters. Rather than defend the breach, BB&T claims the Debtor has not proved any damages.

Not so. Because BB&T breached the parties' contract by failing to provide an accurate estoppel letter, the Debtor is entitled to damages that

---

[116] § 701.04, Fla. Stat.

[117] § 701.04(1), Fla. Stat.

[118] 6/13/16 Trial Tr. at p. 38, l. 5 – p. 39, l. 3; p. 48, l. 12 – p. 49, l. 15; p. 53, ll. 4 – 11; p. 62, ll. 2 – 13.

will put it in the same position it would have been in had BB&T provided an accurate estoppel letter.[119] The Court is persuaded that had BB&T provided the Debtor an accurate estoppel letter, the Debtor could have sold its property to iStorage. And had the Debtor sold its property to iStorage, it could have paid off the BB&T loan and avoided foreclosure. In short, BB&T's breach ultimately forced the Debtor into bankruptcy, so the Debtor is entitled to recover as damages the fees and costs it has incurred in this case.

At trial, the Debtor introduced credible evidence that those damages total $1,464,443: $935,000 in attorney's fees incurred in this case; $245,000 in expected attorney's fees and costs; $31,399 in prepetition opportunity costs; and $6,809 in postpetition opportunity costs.[120] Although there is an argument the nearly $40,000 in prepetition and postpetition opportunity costs naturally and proximately resulted from BB&T's breach, they do not necessarily result from the breach and therefore are not recoverable.[121] Because the remaining $1,180,000 in attorney's fees and costs that have been or will be expended in this case are necessary to put the Debtor in the position it was before the breach, the Debtor is entitled to recover that amount for BB&T's breach of contract.

---

[119] *Capitol Environ. Svcs., Inc. v. Earth Tech, Inc.*, 25 So. 3d 593, 596 (Fla. 1st DCA 2009).

[120] 6/13/16 Trial Tr. at p. 142, l. 6 – p. 153, l. 18.

[121] *Land Title of Central Fla., LLC v. Jimenez*, 946 So. 2d 90, 93 (Fla. 5th DCA 2006).

*The Debtor is not entitled to damages on its tort claims.*

The Debtor's remaining claims are for constructive fraud, tortious interference, and slander of title. These claims are similar to the Debtor's breach of contract claim in that they hinge on proof that BB&T's December 31, 2014 estoppel letter was false. But the tort claims, of course, also require the Debtor to prove that BB&T's representation as to the amount due on the loan was intentionally false. Although the Court has no problem concluding BB&T intentionally misrepresented the amount that was due, the Debtor nonetheless cannot prevail on its tort claims.

The Debtor's constructive fraud claim fails because "[u]nder Florida law, constructive fraud occurs 'when a duty under a confidential or fiduciary relationship has been abused or where an unconscionable advantage has been taken,'"[122] and a confidential or fiduciary relationship does not exist where, like here, two parties are merely dealing at arm's length.[123] As for the tortious interference claim, the letter of intent that BB&T interfered with is not sufficient to create an advantageous business relationship—a prerequisite to a tortious interference claim—because it does not afford the Debtor "existing or prospective legal or contractual

---

[122] *Am. Honda Motor Co., Inc. v. Motorcycle Information Network, Inc.*, 390 F. Supp. 2d 1170, 1179 (M.D. Fla. 2005).

[123] *Id.*

35

rights."[124] At least one Florida court has held a mere offer to sell does not create any attendant legal rights:

> We are aware that a valid advantageous business relationship may exist without the presence of an actual enforceable contract. However, there must be some attendant legal rights in existence between the two operators. A mere offer to sell a business which the buyer says he will consider, does not by itself give rise to legal rights which bind the buyer or anyone with whom he deals.[125]

The Court cannot see any reason why this rule would be any different for an offer to buy. The Debtor's last tort claim—slander of title—fails for the elementary reason that the false estoppel letter was never sent to anyone other than the Debtor.[126]

### *The Debtor is not entitled to punitive damages.*

To recover punitive damages against BB&T under Florida law, the Debtor would have to prove based on clear and convincing evidence that BB&T was guilty of intentional misconduct or gross negligence.[127] In the Court's view, BB&T took advantage of the shared loss agreement to coerce the Debtor into paying $2.1 million more than it actually owed. There was

---

[124] *Ethan Allen, Inc. v. Georgetown Manor, Inc.*, 647 So. 2d 812, 814 (Fla. 1994) (citing *Register v. Pierce*, 530 So. 2d 990, 993 (Fla. 1st DCA 1988)).

[125] *Lake Gateway Motor Inn, Inc. v. Matt's Sunshine Gift Shops, Inc.*, 361 So. 2d 769 (Fla. 4th DCA 1978) (internal citations omitted).

[126] *Loan v. Heather Hills Property Owners Ass'n, Inc.*, 2016 WL 7486287 (Fla. 2d DCA 12/30/15, 2016) (explaining that the elements of slander of title include a falsehood published or communicated to a third party).

[127] § 768.72(2), Fla. Stat.

no downside to BB&T to its "heads I win, tails you lose" approach. If the Debtor paid the $2.1 million more than it owed, BB&T would reap a windfall; if the Debtor defaulted, it would not matter to BB&T because BB&T had already received $1.7 million in reimbursements from the FDIC. But the stakes were exceedingly high to the Debtor: Give in to BB&T's demands or end up in bankruptcy to stop an improvident foreclosure. But having said all that, the Court cannot award punitive damages because punitive damages are only recoverable where a party proves a tort independent from a breach of contract, which the Debtor failed to do here.[128]

## Conclusion

The shared loss agreement is only a win-win when the acquiring bank complies with the FDIC requirement to act prudently. For reasons that are not clear, the FDIC seems to have been asleep at the wheel in this case. The FDIC reimbursed BB&T more than $1.8 million for charge-offs that a state court found were improperly motivated by the financial incentives under the parties' loss share agreement. And since then, the FDIC has sat idly by while BB&T ultimately forced the Debtor into bankruptcy. Fortunately, the bankruptcy process provides an opportunity for a win-win.

In particular, the Bankruptcy Code's cramdown provisions provide the prudent workouts the FDIC favors. Under the Bankruptcy Code's cramdown provisions, secured creditors like BB&T are entitled to be paid in full with

---

[128] *Ferguson Transp., Inc. v. N. Am. Van Lines, Inc.*, 687 So. 2d 821, 822 (Fla. 1996).

interest. This Court has determined BB&T is entitled to a $3,477,752.75

secured claim: $4,590,573 in principal plus $159,354.09 in interest less

$16,794.75 in prepaid interest, $75,379.59 in adequate protection payments,

and $1,180,000 in damages. So under the Debtor's confirmed plan, BB&T

will be paid every penny it is legally entitled to, but the Debtor will not

have to pay one penny more than it owes. In the end, it's a win-win—as it

should have been all along.

The Court will enter a separate final judgment consistent with these

Findings of Fact and Conclusions of Law.

Attorney Stephen R. Leslie is directed to serve a copy of these Findings of
Fact and Conclusions of Law on interested parties who are non-CM/ECF
users and file a proof of service within 3 days of entry of these Findings of
Fact and Conclusions of Law.

**Stephen R. Leslie, Esq.**
**Mark F. Robens, Esq.**
**Stichter Riedel Blain & Postler, P.A.**

**-and-**

**Edward William Collins, Esq.**
**The Law Office of William Collins, P.A.**
    *Counsel for the Debtor*

**Arthur H. Rice, Esq.**
**Craig A. Pugatch, Esq.**
**Rice Pugatch Robinson & Schiller, P.A.**
    *Counsel for Branch Banking & Trust Company*